UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUIS ENRIQUEZ,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

Case No. 05-74556

HONORABLE NANCY G. EDMUNDS
MAGISTRATE JUDGE STEVEN D. PEPE

**REPORT AND RECOMMENDATION**

**I.    BACKGROUND**

Luis Enriquez brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI. Both parties have filed motions for summary judgment, which have been referred to the undersigned pursuant to 28 U.S.C. §636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.    Procedural History**

Plaintiff applied for DIB on January 28, 2002, alleging that he had became disabled on June 1, 2001, due to "eye sight, back, hallucinations, schizophrenia" (R. 61, 63, 78).[1] After Plaintiff's application was initially denied, he had a April 5, 2004, hearing before ALJ Douglas

---

[1] Plaintiff applied for SSI on the same date alleging a disability onset date of July 1, 1990 (R. 173).

1

N. Jones who issued a decision on June 23, 2004, finding Plaintiff not disabled (R. 22-28). Plaintiff submitted the decision to the Appeals Council along with the results of a mental status evaluation that had been conducted on November 20, 2004. The Appeals Council denied Plaintiff's request for review (R. 5-9).

### B.    Background Facts

#### 1.    *Plaintiff's Testimony*

At the hearing Plaintiff testified that he was born on August 25, 1952, and completed the fifth grade (R. 207). He was born in Cuba and came to the United States in 1980 (R. 65). While in Cuba he was placed in prison at the age of 14, apparently for speaking out against Castro (R. 207, 214). He can read and write in Spanish, but only a little in English. He can not read for long periods of time because he gets headaches due to a head trauma suffered at the hands of guard while he was imprisoned in Cuba (R. 216).

At the time of the hearing he was 6'2" and weighed 250 pounds (R. 208). His last employment was with Grossy Contractor in June 2001. He lost this job because, while working his eyebrow was cut by a cable and when he went to the doctor his urinalysis showed marijuana residue (R. 209). He also indicated that he had hurt his back while on the job, but that he was not aware that he was supposed to fill out an accident report, so he did not receive Worker's Compensation for that injury.

In his *Pain Questionnaire* Plaintiff indicated that he had been experiencing eye pain and headaches since age 14 and had begun experiencing back pain in 1988 (R. 73, 97). The back pain was described as stabbing and radiated into his lower back and knees. The pain, caused by "walking all day", was exacerbated by excessive sitting or standing and alleviated a little by lying down. Plaintiff did not take medication because he had no medical insurance (R. 98).

Chiropractic care and massage also helped.  He could walk 4-5 blocks in 7-10 minutes, stand 10 minutes, lift 15 pounds, sit 20 minutes and had no limitations in his arms or hands (R. 99).  He could take care of activities such as cooking, bathing and visiting.

Plaintiff's wife completed a *Daily Activity Sheet* and stated that he slept a lot and experienced a lot of headaches and back pain (R. 100).  She felt he got along well with her, her family and a few friends.  He did not socialize much without her and did not like to be in groups or talk a lot.  He played well with their grandchildren.  He responded well to authority if they were respectful to him.

He did dishes and helped "pick up once in a while".  He liked to fish, camp and take short walks and did not talk very much, unless it was about his native homeland (*Id.*).  She indicated later that he could not drive well, cooked four times per month, cleaned the house two or three times weekly, completed yard work five times monthly, shopped weekly, tried to read but was not proficient, watched their grandchildren two times weekly and groomed himself daily (R. 102).  He played cards monthly, visited relatives once in a while, rarely talked to neighbors or volunteered, and sometimes paid bills, went to movies or out to eat (R. 103).  She did not list any activities for which he required a reminder to finish, but mentioned that sometimes when he was watching television he would begin to shake his head and hands until he noticed her looking and then he would stop (R. 104).

At his hearing Plaintiff acknowledged that he used marijuana three to four days per week, which he received from a friend without charge (R. 212).  He had depressive symptoms three to four times weekly which lasted all day, though medication helped bring the symptoms down to two to three times per week (R. 217, 218).  He also reported hallucinating, in the form of seeing animals or hearing voices; three to four times weekly since the age 15 or 16 (R. 218).  He

explained that had never acted upon the voices' suggestions (R. 221).

He woke up during the early morning hours and had trouble falling back to sleep (R. 219-20).  He did not take naps during the day (R. 220).  He felt that his ability to concentrate was poor, but he could watch a movie from start to finish, after which, he explained, his eyes would be sore and he would have a headache (R. 221-22).

He could vacuum for 15-20 minutes, fish for one hour and ride a bike (R. 222).  He had a friend he visited one to two times weekly (R. 223).

Plaintiff's past work included being a security guard part-time in 1982-1986, which was not considered because it was over 15 years prior to the hearing, and laborer and construction work in 1998-2001 (R. 87, 95).  The most recent work was installing underground cable, during which he drove a high-low and was learning to use a backhoe (R. 90).  He felt he could not return to construction work due to back pain.  When asked whether his depression or schizophrenia would interfere with construction work he responded that his eyes bothered him too much (R. 224).  He did not feel he could do a job that required sitting all day due to back pain and his eye problems (R. 224-25).  He also reported having short-term memory problems (R. 228).

### 2. *Medical Evidence* [2]

Dr. Robert Fritzen, Ph.D, was called by ALJ Jones to testify as the Medical Expert (ME) in this matter, and was stipulated to by Plaintiff's attorney (R. 228).  ME Fritzen noted that there were only three notes in the record relative to psychiatric contact and inquired whether more

---

[2] The medical records in this matter are not summarized both because ALJ Jones provides a comprehensive and undisputed summary of the records in his decision (R. 23-27) and Plaintiff is not challenging the denial of benefits based upon the record evidence, but rather submits this matter for review based on new evidence.

4

were available to him (R. 229). ALJ Jones clarified that Plaintiff testified that he visited his psychiatrist, Dr. Lethia, every three months, but that the only information in the record was dated February 2002 – two years prior to the hearing. Plaintiff's attorney offered to have Plaintiff's community mental health worker testify regarding the gap in records, but ALJ Jones refused because the worker was neither a psychologist nor psychiatrist and the testimony would not be "on point" (R. 230). ALJ Jones said to ME Fritzen "I guess your testimony will be based on what we've got."

ME Fritzen testified that, based upon the documentation, Plaintiff was diagnosed with chronic undifferentiated schizophrenia (Listing 12.03) and dysthymia (Listing 12.04) and likely cannabis abuse (Listing12.09) (R. 230).

ME Fritzen felt that the impairments were likely present before June 2001 (R. 231). While Plaintiff's impairments met the "A" criteria for Listings 12.03, 12.04 and 12.09, he did not meet the "B" and "C"criteria, which is required for a finding of disability. Plaintiff had moderate restrictions of activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. This was slightly more restricted than the findings of the state evaluator, Ronald C.Marchall, Pd.D. LP, completed a Psychiatric Review Technique Form ("PRTF") on March 3, 2002 (R. 146 & 156) (See also R. 160- 161 with a few moderate limitations, but most categories considered not significantly limited.)

Plaintiff had a slight limitation in his ability to: remember and carry out short and simple instructions, be aware of normal hazards and take ordinary precautions and interact appropriately with coworkers (R. 232-34). He was moderately limited in his ability to: understand and remember detailed instructions, make work-related decisions, concentrate for extended periods of time (up to ten minutes), perform activities within a schedule and be punctual, interact

appropriately with the general public and supervisors, respond to work pressures, respond to changes in a work setting and complete a normal workday without interruptions for psychologically based symptoms. He was markedly limited in his ability to carry out detailed instructions (R. 233).

ME Fritzen opined that Plaintiff's marijuana use could exacerbate symptoms of loose associations and loose cognitive patterns, and contribute to decompensation for schizophrenics (R. 236-37). He believed that it would be important for Plaintiff's treators to determine how his marijuana use effected his symptoms. ME Fritzen explained that he would need to see the notes from the doctor to determine how Plaintiff's marijuana use effected his symptomology (R. 237). He also needed to review treatment notes to determine how Plaintiff's hallucinations effected his functioning, i.e. how Plaintiff responded to the hallucinations, given the fact that his condition had been chronic for a long time and some patients were able to learn to cope with hallucinations (R. 235, 238).

Based upon ME Fritzen's recommendation that further records be reviewed, if available, Plaintiff's counsel requested additional time to supplement the record (R. 243). ALJ Jones agreed to allow the record to remain open for 30 days following the hearing to allow Plaintiff's attorney to supplement the record with "community mental heath records to . . . fully develop the record".

### 3. *Vocational Evidence*

Judith Findora testified as the Vocational Expert (VE) (R. 238). She classified Plaintiff's past work as light and unskilled. His laborer and cable installer jobs were earlier classified as medium to heavy and unskilled (R. 116). ALJ Jones asked VE Findora to consider a hypothetical person of Plaintiff's age (51), "marginal" education and past work experience who

was able to perform work at any exertional level that involved: no detailed instructions or extended periods (over 5 minutes) of concentration or attention for any given task; only occasional interaction with supervisors or members of the general public; only occasional changes in work setting or procedure; only occasional need for independent planning or decision making; no preparation or interpretation of written materials (R. 240).

VE Findora stated that such a person could perform Plaintiff's past work, with the caveat that installing cable and landscaping would require a change of setting, though the job would not change (R. 240-41). VE Findora also explained that a restriction against use of fine vision would not preclude any of Plaintiff's past work (R. 241).

VE Findora also opined that the hypothetical person could perform medium exertional positions available in the regional economy including: janitorial (84,000), housekeeping (11,000) and laundry (2,000).

Adding a restriction to light work with a sit/stand option would prevent the hypothetical worker from performing Plaintiff's past work, but light exertional positions available in the regional economy could still be performed, including: inspector (8,000), machine operator (20,000), sorter (1,500) and security (8,000) (R. 242).

If the person were unpredictably absent or unable to complete work for 8 hours per work-week, this would eliminate all employment.

### *4.    The ALJ's Decision*

ALJ Jones found that Plaintiff met the nondisability requirements and was insured for benefits through the date of his decision (R. 27). Plaintiff had a combination of impairments that met the definition of severe set forth in 20 C.F.R §404.1520(b) and §416.920(b), but they did not meet or equal a listed impairment in Appendix 1, Subpart P, Part 404 of the Regulations (the

Listing), in particular he did not meet the "B" or "C" criterion of the Listings for his mental impairments (R. 25-26).  ALJ Jones found Plaintiff not fully credible regarding his alleged hallucinations and other alleged mental limitations due to their inconsistency with objective medical evidence, absence of more aggressive treatment (including no psychiatric hospitalization), his extensive ordinary activities and his continued marijuana use.

Plaintiff had the residual functional capacity (RFC) to perform heavy work which involved no visual acuity, detailed instructions or extended periods of concentration; only occasional (up to 33%) interaction with supervisors or members of the general public, occasional changes in the work setting or procedures, occasional independent decision-making or planning; and no preparation or interpretation of written material (R. 27-28).

ALJ Jones found that Plaintiff's past work as a production worker, underground cable installer and sprinkler installer did not require activities that would be precluded by this RFC. Therefore, Plaintiff was not under a disability as defined by the Social Security Act (R. 27-28).

**II.    ANALYSIS**

    **A.    Standards of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In the present case, Plaintiff seeks review and remand solely on the basis of evidence submitted for the first time to the Appeals Council, a so-called "sentence-six" remand. A district court may order a sentence six remand for the taking of additional evidence if the claimant shows (i) that the evidence at issue is both "new" and "material," and (ii) that there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir.1996). The party seeking a remand bears the burden of showing that these two requirements are met. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

"[E]vidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding." Most courts that have specifically addressed the issue of defining "materiality" in sentence six have not adopted "materiality" standard for relief from a final judgment under Fed. R. Civ. P. 60(b) that the "evidence must be *reasonably likely* to have resulted in a different decision by the Secretary." The prevailing view in the circuits is that the finality of decisions should apply less rigidly to administrative proceedings than judicial proceedings, especially in light of the remedial purposes of the Social Security Act that should be liberally construed. These courts find the materiality element satisfied where there is a *"reasonable possibility"* that the new evidence would have changed the outcome of the determination. *See, e.g., Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987); *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985); *Dorsey v. Heckler*, 702 F.2d 597 (5th Cir. 1983);

*Booz v. Secretary*, 734 F.2d 1378, 1380-81 (9th Cir. 1981).[3]

Yet, the Sixth Circuit in a series of cases – none of which specifically addressing the specific issue of defining materiality under sentence six – continues to state that materiality under sentence six requires a showing the new evidence has a "reasonable probability" of changing the outcome. *Hollon ex rel. Hollon v. Commissioner of Social Sec.,* 447 F.3d 477 (6th Cir. 2006), which cites *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001), which in turn quotes from *Sizemore v. Secretary of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir.1988).

> Such evidence, in turn, is deemed "material" if "there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Foster,* 279 F.3d at 357 (internal quotation marks and citation omitted).

*Hollon,* 447 F.3d at 484.

*Sizemore,* which was the first major case adopting the "reasonable probability standard, cites *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir.1980); *Ward v. Schweiker*, 686 F.2d 762, 764-65 (9th Cir.1982) and *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir.1981), in support of the proposition that the claimant must demonstrate that there was a "*reasonable probability*" that the Commissioner would have reached a different disposition of the disability claim if presented

---

[3] *King v. Califano*, 599 F.2d 597 (4th Cir. 1979), and *Cagle v. Califano*, 638 F.2d 219 (10th Cir. 1981), determined that the new evidence must be material in the sense that SSA's decision "might reasonably have been different" had the new evidence been before the ALJ. *Dorsey v. Heckler*, 702 F.2d 597 n.9 (5th Cir. 1983), and before it *Chaney v. Schweiker*, 659 F.2d, 679 n.4 (5th Cir. 1981), misconstrued the *King* and *Cagle* cases as adopting the "materiality" standard for relief from a final judgment under Fed. R. Civ. P. 60(b) that the "evidence must be *reasonably likely* to have resulted in a different decision by the Secretary." *Borders v. Heckler*, 777 F.2d 954, 956 (4th Cir. 1985), in a careful analysis concludes that the *King* case has been misquoted and the Fourth Circuit does *not* have a "stricter" standard. The Seventh Circuit, in adopting the "reasonable possibility" standard, also noted that there is only a "pseudo-conflict among the circuits," with the Fourth and Tenth Circuits being wrongly quoted as requiring a Rule 60(b) type showing. The Tenth Circuit, like the Fourth Circuit, had always adhered to the "reasonable possibility" standard. *Godsey v. Bowen*, 832 F.2d 443, 444 (7th Cir. 1987).

with the new evidence. Yet these cases do not support that proposition. *Carroll* in discussing "good cause" only required a showing that "newly submitted evidence would not result in a '*reasonable chance*' that the Secretary would reach a different conclusion." *Carroll v. Califano,* 619 F.2d at 1162. Nowhere does *Carroll* suggest a stricter standard for the materiality standard of sentence six. Similarly, the *Ward* and *Chaney* courts used the "reasonable possibility" standard. *Ward v. Schweiker*, 686 F.2d at 764 -765; *Chaney v. Schweiker*, 659 F.2d at 679, fn 4. Thus, it seems clear that *Sizemore,* misread the cases it cites for coming up with the reasonable probability standard instead of reasonable possibility standard. Given the majority trend in other circuits, and the more liberal reading given the Social Security Act in light of its remedial nature, it seems that if the Sixth Circuit carefully addressed this specific issue of the materiality standard, it would abandon its reasonable probability standard that was erroneously based on cases that used the "reasonable chance" or "reasonable possibility" standard.[4]

### B.   Factual Analysis

ALJ Jones found that Plaintiff's impairments – reduced visual acuity; chronic undifferentiated schizophrenia; marijuana use; dysthmia; polysubstance abuse (in remission) – were collectively severe but did not meet the Listings. Plaintiff does not challenge this finding.

Instead, Plaintiff asks the court to consider a report generated on November 20, 2004, five months after ALJ Jones' June 23, 2004, decision, and submitted to the Appeals Council for review (R. 191). This report indicates that Plaintiff scored 65 on the performance section of the Wechsler Adult Intelligence Scale-III, which the testing physician opined "places him in the mild mental retardation range for these skills". Because of language problems he was unable to

---

[4] The undersigned has analyzed the materiality of Plaintiff's new evidence under both the "reasonable probability" and "reasonable possibility" standard.

complete the verbal and math portions of that test.

In order to support his argument that there was good cause for his not producing this evidence prior to or during the hearing, or during the 30-day extension ALJ Jones gave for submitting supplemental documentation, Plaintiff attempts to shift the burden to ALJ Jones. Yet, while it is true that an ALJ has a duty to develop the record, the extent of that duty does not include discovering and developing the record regarding impairments that are not brought to the ALJ's attention nor otherwise apparent.

While acknowledging that is a claimant's duty to prove disability, Plaintiff argues that the record contains evidence that he is "illiterate and only had a fifth grade education", and argues that this should have put ALJ Jones on notice that intelligence testing was required (Dkt. # 10, p.2).

Plaintiff presented evidence at the hearing that he had been diagnosed with schizophrenia and dysthemia and testified to weekly use of marijuana and a closed head injury which caused headaches and eye soreness when Plaintiff reads. Plaintiff also explained that he was placed in prison at the age of 14 in Cuba for 1-2 years. Further, though he studied English as a second language for 2 years as an adult, Plaintiff is not a native English speaker (R. 215). Plaintiff also testified that he could read and write in Spanish and that he could read and write a little in English (R. 207, 215). He acknowledged that he "sometimes" could read a newspaper but "not anymore" because after 10-15 minutes he gets a headache and has problems with his eye (R. 215). Therefore, there is nothing in the record to indicate that Plaintiff is illiterate, as his new counsel now argues, as opposed to merely not being bilingual. Nor is there evidence that his failure to go beyond fifth grade stems from a low IQ as opposed to his situation in Cuba and his resulting closed head injury and/or his mental health impairments or drug use. Plaintiff can read and write

in Spanish and has held various jobs including operation of a back hoe.

At any rate, apparently neither Plaintiff, his previous treators nor his attorney at the hearing phase felt that Plaintiff's intelligence was at issue, so it can hardly be said that ALJ Jones' duty to develop the record included diagnosing Plaintiff during his limited contact with Plaintiff at the hearing. Thus, there is evidence from Plaintiff 's testimony that he can read and write in Spanish, and other evidence the he has held various jobs including one operating a fork lift.

Plaintiff suggests a second argument for good cause, that being that he was perhaps under-represented at the hearing by his Legal Services attorney (Dkt. # 10, pp. 1-2). It is often the case that a claimant hires new counsel for appeal of the administrative process and that the newly hired attorney, having the benefit of the record and the ALJ's opinion, finds that he or she would have approached the case differently – would have ordered more or different tests or asked different questions on cross, etc. Yet each newly hired attorney's vision of how a case should have been presented cannot support good cause for reopening the case. *Geyen v. Secretary of Health and Human Services*, 850 F.2d 263, 264 (5th Cir. 1988) (new counsel after the administrative process concluded, sending claimant to a psychologist that determined he was retarded -"is not the sort upon which we can hold the trial court in error. Such a rule would require that court to order a new beginning in such a matter whenever an applicant acquires a new lawyer with a new idea."). While *Sears v. Bowen*, 840 F.2d 394, 399 (7th Cir. 1988), found good cause existed for not previously incorporating a psychiatric report into the proceedings where claimant did not begin to see a psychiatrist until after the Appeals Council had denied the claim, that holding was apparently based on the court finding that "it is evident from the record that he was not an expert retained solely for the purpose of establishing a disability." Here, it appears that the psychiatric evaluation was obtained at the direction of his new counsel for the "purpose of establishing a

disability" and not in the course of normal medical treatment.  Thus, the *Sears* case is distinguishable.

Regarding the issue of the materiality of the new evidence, Plaintiff would need to demonstrate mental retardation (here the asserted I.Q. of 65) before his 22nd birthday (i.e. August 25, 1974) in order to argue that he meets Listing 12.05 for mental retardation.[5]  Plaintiff's claimed disability onset dates June 1, 2001, for DI (R. 61) and July 1, 1990, for SSI (R. 173) are after his 22nd birthday, which does not support disabling mental retardation before age 22.  Thus one could say that Plaintiff does not meet the "diagnostic description in the introductory paragraph" of 12.05, and no further analysis under subparagraphs A-D is required.

Again,  given (1) the lack of prior I.Q. tests, (2) his past work record, (3) his ability to read and write in Spanish, and (4) likely questions about the reliability of the new evaluation being

---

[5] The relevant portions of Listing 12.05 follow:
> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> ****
> B. A valid verbal, performance, or full scale IQ of 59 or less;
> Or
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> Or
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> >    1. Marked restriction of activities of daily living; or
> >    2. Marked difficulties in maintaining social functioning; or
> >    3. Marked difficulties in maintaining concentration, persistence, or pace; or
> >    4. Repeated episodes of decompensation, each of extended duration.

proffered with its partial I.Q. testing due to language problems[6] it cannot be said there is a reasonable possibility that this new evidence would change the finding that Plaintiff does not meet the Listing of Impairments even if evaluated under Listing 12.05.  There is no reasonable possibility that Plaintiff can demonstrate with reliable evidence that he was mentally retarded prior to his 22nd birthday.

In addition to the new evidence's possible – albeit inadequate – relevance to Listing 12.05, the new report could be relevant to Plaintiff's RFC.  Yet, it is cumulative on the RFC issue on which substantial evidence was presented.  Plaintiff's RFC is no different than that presented at the hearing regardless whether his limitations are a result of his limited I.Q., marijuana use, schizophrenia, or dysthymia all of which were evaluated by the ALJ.  Regardless of what impairment limited Plaintiff, he had a substantial work history, and there is substantial evidence in the record to uphold ALJ Jones' discounting of Plaintiff's credibility and finding him capable of performing his past work.  There is no reasonable possibility that his new report would lead to a different result.[7]

In sum, Plaintiff has failed to meet his burden of showing under sentence six of §405(g) that good cause exists for his failure to present evidence of his intelligence test score before ALJ Jones issued his opinion, and Plaintiff has further failed to show the new evidence is material to a finding under Listing 12.05, or material and non-cumulative regarding Plaintiff's RFC .

---

[6] Plaintiff's counsel notes that the examiner "could understand an estimated 50% of [Plaintiff's] speech" and relied on Plaintiff's wife to help translate (R. 192).

[7] To the extent the Sixth Circuit, given the chance to analyze the distinction, would reiterate its currently articulated standard of "reasonable probability" instead of the "reasonable possibility" standard, Plaintiff's new evidence would also not be considered material under this clearly more stringent standard.

**III.    RECOMMENDATION**

For the reasons stated above, IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Motion for Summary Judgment be GRANTED.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days, as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: October 31, 2006                                                         s/Steven D. Pepe
Ann Arbor, Michigan                                                              United States Magistrate Judge


Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means and or U. S. Mail on October 31, 2006.
                                                                                s/Deadrea Eldridge
                                                                                Courtroom Deputy Clerk